Argued and submitted June 2, 2022, reversed and remanded June 14, petition for review denied October 19, 2023 (371 Or 509)

Valerie MALTAIS
and David Richardson,
*Plaintiffs-Appellants,*

*v.*

PEACEHEALTH,
a Washington nonprofit corporation,
dba PeaceHealth Sacred Heart Medical
Center at RiverBend, and
Sarah L. Coleman, MD,
*Defendants-Respondents.*

Lane County Circuit Court
19CV27100; A174706

532 P3d 510

Plaintiffs appeal a judgment dismissing their claims for negligence against defendants PeaceHealth and Sarah L. Coleman, MD. Defendants were medical providers for Maltais's adult son. Maltais alleged that defendants negligently handled her son's deteriorating psychiatric condition, and that as a result, she suffered a physical injury and noneconomic damages when he experienced a psychotic episode and stabbed Maltais. The trial court ruled that defendants owed no duty to Maltais, who was not herself a patient, and it dismissed the claims on that basis. On appeal, plaintiffs argue that their complaint alleged facts which, if proven, would support a reasonable inference that defendants owed a duty of care that extended to Maltais. *Held*: Under the analysis in *Tomlinson v. Metropolitan Pediatrics, LLC*, 362 Or 431, 412 P3d 133 (2018), the trial court erred in dismissing the claims. Plaintiffs alleged sufficient facts to establish that Maltais's own relationship with defendants and her role in her son's medical and psychiatric care entailed a mutual expectation of service and reliance with the medical providers, giving rise to the providers' obligation to protect Maltais's interests.

Reversed and remanded.

R. Curtis Conover, Judge.

Gregory Kafoury argued the cause for appellants. Also on the briefs was Kafoury & McDougal.

Ruth A. Casby argued the cause for respondent PeaceHealth Corp - Sacred Heart Medical Center. Also on the brief were Janet M. Schroer and Hart Wagner LLP.

Hillary A. Taylor argued the cause and filed the brief for respondent Sarah L. Coleman, MD.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

Plaintiffs Valerie Maltais and David Richardson, her husband, appeal a judgment dismissing their claims for negligence against defendants PeaceHealth and Sarah L. Coleman, MD. Defendants were medical service providers for Maltais's adult son, N. H., who suffers from paranoid schizophrenia and severe intellectual disabilities. In her claims, Maltais alleges that she suffered a physical injury and noneconomic damages as a result of defendants' negligent handling of N. H.'s deteriorating psychiatric condition, leading to a psychotic episode during which N. H. stabbed Maltais, puncturing her lung. Richardson alleges that he suffered noneconomic damages for loss of spousal consortium and emotional distress as a result of witnessing the attack.

On appeal, plaintiffs contend that the trial court erred in granting judgment on the pleadings for failure to state a claim under *former* ORCP 21 A(8) (2018), *renumbered as* ORCP 21 A(a)(h) (2022), on the basis that defendants owed no duty to the nonpatient plaintiffs. We conclude that, if proven, the facts alleged in the complaint support a reasonable inference that defendants owed a duty of care that extended to Maltais. As such, we do not reach plaintiffs' alternative argument that the court erred in failing to give plaintiffs leave to amend their complaint. Accordingly, we reverse the trial court's dismissal of the complaint with prejudice and remand for further proceedings.[1]

## I.  BACKGROUND

In reviewing a judgment dismissing a complaint, we accept as true the facts alleged in the complaint and draw all reasonable inferences from those allegations in favor of plaintiffs. *Tomlinson v. Metropolitan Pediatrics, LLC*, 362 Or 431, 434, 412 P3d 133 (2018). Our task is to "determine whether upon the facts alleged *** no reasonable factfinder could decide one or more elements of liability" in favor of plaintiffs. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). The alleged facts are as follows.

---

[1] We do not address Richardson's claims because the parties and the court treated those claims as derivative of Maltais's claims.

Maltais is the biological mother of N. H., an adult who suffers from paranoid schizophrenia and severe intellectual disabilities. N. H. lived in the family home with Maltais and Richardson. He was "profoundly disabled" by his conditions and Maltais was his primary caregiver. She managed his medical care and accompanied him to his medical visits, including visits with his psychiatrist and other medical providers at PeaceHealth, for many years. She was responsible for communicating necessary medical information to providers and was authorized to receive medical information concerning N. H.

N. H.'s psychiatric condition deteriorated in January 2018. He began to exhibit severe and uncharacteristic symptoms, including hearing voices. He feared that he was losing control of himself and that he would harm himself and his family; specifically, he felt driven to stab his family members with a knife. Concerned that N. H. had become dangerous, Maltais took him to PeaceHealth's Emergency Department (ED) on January 28, 2018. Hospital staff interviewed N. H. and released him.

The following day, January 29, Maltais took N. H. to his regular psychiatrist at PeaceHealth, Carolyn Hartman, MD. Maltais explained the symptoms that N. H. was experiencing, and told Hartman about their visit to the ED. Hartman evaluated N. H.'s condition and noted in his chart, "Due to active psychosis and recent threats, dangerousness is clear."

On January 30, Hartman communicated to Maltais that she would inform the ED that N. H. needed to be admitted because he was a danger to himself and others. Hartman then called an intake worker and a crisis worker at the ED and reported that N. H. was her patient, that he was coming to the ED, and that he should be admitted. Next, Hartman spoke to an ED doctor and explained that N. H. wanted to be admitted and that admission was appropriate because he was dangerous to himself and others. The ED staff members agreed that they would admit N. H. when he arrived.

Later that day, Maltais again took N. H. to the ED. However, there had been a shift change since Hartman's calls. The ED staff, including defendant Coleman, did not

admit N. H. and, that same day and in Richardson's presence, N. H. stabbed Maltais with a knife, puncturing her lung.

Plaintiffs allege that defendants PeaceHealth and Coleman were negligent:

"(a)  In failing to restrain, admit, or secure [N. H.], when they knew or had reason to know that he was mentally ill and a danger to himself or others;

"(b)  In failing to convey the decision to admit [N. H.] to a responsible medical staff at the change of shift;

"(c)  In failing to adequately document the decision to admit [N. H.];

"(d)  In failing to actively review available medical documentation, including *** Hartman's records, prior to declining to admit [N. H.];

"(e)  In failing to secure available information regarding [N. H.]'s mental status and risk from *** Maltais when she was present and available to be interviewed;

"(f)  In failing to devise an adequate system for conveying recently-received medical information from practitioners during one shift to practitioners in the next shift;

"(g)  In refusing to allow *** Maltais to be present while her son was interviewed."

Defendants moved to dismiss the complaint, arguing that they did not cause Maltais's injuries and that the lack of a physician-patient or other special relationship between the parties was fatal to plaintiffs' claims. Plaintiffs maintained that the claims were cognizable under a theory that defendants' conduct unreasonably created a foreseeable risk of physical harm to others and that they were therefore liable for the resulting injuries. Defendants responded that *Tomlinson* controls the analysis for third-party medical negligence claims such that plaintiffs must have alleged independent interests that defendants were obligated to protect to allege that a duty runs from defendants to plaintiffs. The trial court granted defendants' motion to dismiss the complaint with leave to replead facts that would demonstrate that defendant owed a duty to plaintiffs.

Plaintiffs filed a second amended complaint, adding a lengthy paragraph detailing the relationship between Maltais, N.H., and his medical providers.[2] It describes her history of participating in his medical and psychiatric appointments at PeaceHealth and her role in communicating medical information to providers about his care. Plaintiffs alleged that Maltais performed that role because N.H.'s disabilities made him dependent on her. Defendants then renewed their arguments that the complaint was legally insufficient because plaintiffs did not meet the standard articulated in *Tomlinson* to state a third-party medical negligence claim, that is, that the complaint failed to allege facts showing that defendants had a duty that ran to plaintiffs. The trial court dismissed that complaint with prejudice.

Plaintiffs appeal, assigning error to the trial court's dismissal of their claims with prejudice, arguing once again that medical providers can be liable for foreseeable physical injuries to third parties resulting from the negligent treatment of their patients.

## II.   ANALYSIS

Under Oregon law, a person whose conduct unreasonably creates a foreseeable risk of harm to others and causes an injury is generally liable for that injury, "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty." *Fazzolari*, 303 Or at 17. Here, the negligent conduct alleged is defendants' failure to diagnose N.H.'s psychiatric condition and dangerousness, and their failure to admit, secure, or restrain him. In defending against these claims, defendants invoke the doctor-patient relationship and the professional standard of conduct that structures their

---

[2] Although this paragraph describes facts about the relationship between the parties that are relevant to all of plaintiffs' claims, the second amended complaint locates it between plaintiffs' first and second claims for relief with a section title stating that it is another second claim for relief, though no claim for damages is alleged in that section. For the purposes of this opinion, we treat this as an editing error and read it as a factual allegation that is relevant to the four claims alleged in the complaint. Defendants do not argue before this court that their substantial rights were affected by this defect in the pleading. ORCP 12; *Hawkins v. City of La Grande*, 315 Or 57, 63, 843 P2d 400 (1992).

duties. They argue that plaintiffs' claims are not cognizable because their professional duty of care was owed only to their patient and not to third-party plaintiffs.

The Supreme Court recently articulated the professional standard of care for physicians in *Tomlinson*:

> "When a physician holds herself out as such and undertakes to provide medical services, the physician represents having a certain level of medical skill and competence * * *. In doing so, the physician invites a patient (or others acting to advance the patient's interests) to rely on the physician to provide the patient with the level of care that a reasonably prudent, careful, and skillful practitioner of the physician's discipline would have provided to the patient under the same or similar circumstances and within the same community. The law therefore imposes on a physician an obligation to meet that standard of care, which is defined by the scope of the physician's undertaking."

362 Or at 444 (citations omitted). The *Tomlinson* court explained further that this standard of care does not function to limit a physician's professional duty to just their patients. As in other professional settings, whether a physician has a duty that runs to a nonpatient third party depends on "the existence of an undertaking, express or implied, between the [professional] and the third party." *Id*. at 445. We therefore turn to the reasoning in *Tomlinson* to guide our analysis of plaintiffs' claims.

In that case, the plaintiffs were the parents of a child who began exhibiting developmental abnormalities. The defendants, the child's medical providers, undertook to discover the cause of those abnormalities but failed to do so before the plaintiffs had another child. The older child was ultimately diagnosed with an inheritable genetic disorder with severe and potentially debilitating symptoms. The parents alleged that the defendants negligently failed to perform appropriate diagnostic testing for the child's symptoms and therefore failed to timely diagnose the genetic disorder. As a result, the defendants also failed to timely inform the parents of their own reproductive risks as carriers of the defective gene. The parents sought economic damages for, among other things, the cost of medical care for their second

child who was also born with the condition, as well as non-economic damages for emotional distress. *Id.* at 435.

Plaintiffs correctly point out that the injuries alleged in *Tomlinson* were economic and emotional and, on that basis, argue that the analysis does not apply in a case such as this one where a third-party plaintiff suffered a physical injury. They focus their arguments on lines of reasoning that we do not find persuasive.[3]

---

[3] Plaintiffs first argue that their claims may proceed under a common-law foreseeability analysis, whereby a physician may be liable to third parties when their negligent treatment of patients creates a foreseeable risk of physical injury to those third parties. *See Horton v. OHSU*, 277 Or App 821, 373 P3d 1158 (2016) (reversing dismissal of a mother's claims for injuries resulting when she donated a portion of her liver to save her child as a foreseeable result of negligently performed liver surgery, holding that the mother's claims were not foreclosed by the absence of a physician-patient relationship between herself and the defendant medical providers); *Zavalas v. Dept. of Corrections*, 124 Or App 166, 861 P2d 1026 (1993), *rev den*, 319 Or 150 (1994) (reversing an award of summary judgment to the defendant doctor and rejecting his arguments that a physician has no duty to third parties harmed as a foreseeable result of negligent treatment of a patient); *Docken v. Ciba-Geigy*, 86 Or App 277, 739 P2d 591 (1987), *rev den*, 304 Or 405 (1987) (reversing dismissal of claims brought by the estate of patient's brother against prescribing physician, pharmacy, and drug manufacturer, holding that his claims for the fatal injury he suffered as a result of ingesting his brother's medication were not foreclosed by the absence of physician-patient relationship between himself and the defendants). The difficulty with this line of reasoning is that, at common law, there is no duty to protect another from the conduct of a third party in the absence of a relationship creating such a duty. *See generally Restatement (Third) of Torts: Phys. & Emot. Harm* § 37 (2012). The cases cited by plaintiffs do not establish the existence of a general rule under Oregon law that a physician or medical provider is liable any time its actions create a foreseeable risk of injury to any third party.

Relying on *Cain v. Rijken*, 300 Or 706, 717 P2d 140 (1986), and ORS 426.232, plaintiffs also argue that defendants have a statutory duty to protect the public from persons with mental illness who are dangerous to others. The statutory duty in *Cain* was based on the defendants' supervisory authority over Rijken who had been put under the jurisdiction of the Psychiatric Security Review Board (PSRB) and conditionally released under the supervision of Providence Medical Center. That "obligation to supervise Rijken's conduct for the protection of the public" was "derived from the statutes defining the assignment Providence undertook for PSRB." *Id.* at 717; ORS 161.336; ORS 161.390(3). The court opted to create a private right of action to enforce that duty even though the legislature neither expressly nor impliedly created such a right. *Doyle v. City of Medford*, 356 Or 336, 350, 337 P3d 797 (2014). The statutory scheme laid out in ORS chapter 426 is not analogous insofar as it does not create an obligation for private practitioners to exercise that heightened level of supervision over a person. Furthermore, it specifically confers immunity from liability to practitioners exercising the powers granted under that chapter. *See* ORS 426.335(5) ("A licensed independent practitioner, hospital or judge may not be held criminally or civilly liable for actions pursuant to ORS 426.228, 426.231, 426.232, 426.234 or 426.235 if the licensed independent practitioner, hospital or judge acts in good faith, on probable cause and without malice.").

For purposes of this case, we use *Tomlinson* as a guide for our analysis of the duty owed to plaintiffs for two reasons. First, in *Tomlinson*, the Supreme Court applied its analysis in the context of an alleged failure to protect the parents from a risk of harm that the defendants did not themselves create. The injuries in that case were a result of reproductive risks associated with the parents' preexisting genetic condition and the failure of the defendants to diagnose that condition in their child. *Id.* at 442-43. Similarly, Maltais suffered an injury that resulted from risks posed by N. H.'s preexisting psychiatric condition and defendants' alleged failure to appropriately assess that condition. *See id.* at 460 n 15. Second, the test for whether the breach of a duty can give rise to liability for a physical injury suffered by a third party should be no more demanding than the test that applies to a third-party claim for economic and emotional harms as described in *Tomlinson*; put another way, the test for economic and emotional harms might well be more demanding than that for physical injuries, *see id.* at 443 ("without some justification for providing legal protection, a person is not generally required to affirmatively protect the economic and emotional interests of others"), but, in any event, the test would not be less demanding. Because we ultimately conclude that plaintiffs have met that test, it is an appropriate measure to use in this case.

*Tomlinson* explains that the relationship between a professional and third parties who are not their clients may, in appropriate circumstances, support that third party's negligence claim:

> "[I]n carrying out a professional obligation to a client, the professional may be required to protect the interests of a third party as well. In such circumstances, the professional's relationship with a client not only gives rise to an obligation to protect the interests of the client, but it also can give rise to an obligation to protect the interests of a third party. The facts of particular cases will determine what interests and what third parties receive such protection."

362 Or at 445. Such a determination will be made "on a case-by-case basis" and the court identified three considerations

that may guide that determination: "whether the relationship between the parties is a type of relationship that generally entails a mutual expectation of service and reliance," "whether the potential plaintiffs were identifiable to the defendant or otherwise could be defined as a class that avoids indeterminate liability," and "whether recognizing such a claim would interfere with or impair the loyalties that the professional owes to the client." *Id.* at 446.[4]

        With those considerations in mind, we turn to plaintiffs' factual allegations, mindful that "a complaint must allege facts, not legal theories." *Fazzolari*, 303 Or at 15. To determine whether the facts alleged in plaintiffs' complaint sufficiently stated a negligence claim against defendants, we assume the truth of all well-pleaded factual allegations in the complaint and draw all reasonable inferences from those allegations in favor of plaintiffs. *Tomlinson*, 362 Or at 434.

        As to the relationship between the parties, plaintiffs allege that defendants undertook to assess and treat N. H.'s psychiatric condition, specifically, to assess whether his worsening symptoms posed a danger to himself or his family members. Plaintiffs allege that Maltais had a history of participating in the psychiatric and medical care that N. H. received at PeaceHealth for many years prior to the incident at issue. They allege that she managed his medical and psychiatric care because his own ability to do so was severely impacted by his psychiatric condition and his

---

    [4] Defendants argued before the trial court that *Tomlinson* requires plaintiffs to allege that they had a separate legally protected interest, wholly independent of N. H.'s interest in receiving non-negligent medical care, in order to state a claim against defendants. Although *Tomlinson* does explain that the parents in that case had a legally protected interest in reproductive autonomy, the medical providers' duty to protect that interest arose out of their undertaking to diagnose the child's genetic condition and therefore was not wholly independent. *Id*. at 446-47. Identifying a protected interest, here, is simply a way to establish that plaintiff suffered some legally cognizable damage. As discussed below, all persons in Oregon have a legally cognizable interest in being free from physical harm at the hands of others. The requirement that plaintiffs must identify and allege an independent legally protected interest is better understood in its original context, which is to serve as a limit on liability for economic harms and emotional distress damages. *See, e.g.*, *I. K. v. Banana Republic, LLC*, 317 Or App 249, 505 P3d 1078 (2022); *Rathgeber v. James Hemenway, Inc.*, 176 Or App 135, 30 P3d 1200 (2001), *aff'd*, 335 Or 404, 69 P3d 710 (2003); *see also Philibert v. Kluser*, 360 Or 698, 385 P3d 1038 (2016).

intellectual disabilities. They allege that she accompanied him on his three visits to PeaceHealth that are the factual basis for their claims, and that she alerted the psychiatrist there to the specific threat that N. H. posed to her, that is, that he was experiencing urges to stab his family members with knives.

Based on the facts alleged, defendants' professional undertaking could reasonably include Maltais in her role as N. H.'s primary caregiver and as a person endangered by his condition. A factfinder could reasonably infer from the facts alleged that the providers at PeaceHealth and N. H. relied on Maltais to ensure that N. H. received appropriate care in light of his disabilities, and that this role is reflected in his medical records. Those facts could also support the additional inference that Maltais, in turn, relied on the providers at PeaceHealth to come to a correct diagnosis of N. H.'s deteriorating condition and to provide him with appropriate treatment, which would mitigate both the risk he posed to himself and also the specific risk he posed to her physical safety while she acted as his caregiver. Those allegations are sufficient, if proved, to show that the relationship between the parties fell within the scope of a professional undertaking giving rise to legal protection.

As to whether "the potential plaintiffs were identifiable to the defendant," *id*. at 446, plaintiffs allege that Maltais was present during the three encounters that are the subject of this litigation and that N. H. expressed a specific concern that he was being driven to do physical harm to his family members. Plaintiffs further allege that Maltais was N. H.'s mother and current caregiver. The allegations of negligence support an inference that defendants should have been aware of her relationship to N. H. and the danger he posed to her safety. On these facts, defendants could readily identify Maltais as a person who was at risk of physical harm at the hands of their patient.[5]

Finally, we turn to the issue of whether recognizing Maltais's claim "will interfere with or impair the loyalties

---

[5] As such, it is not necessary to determine whether plaintiffs "otherwise could be defined as a class that avoids indeterminate liability." *Id*.

that the professional owes to the client." *Id*. at 446. The reasoning in *Tomlinson* is instructive here. The court explained that, in undertaking to provide medical care to their patient, the defendants in that case were subject to a professional standard of care to "provide the patient with the level of care that a reasonably prudent, careful, and skillful practitioner of the physician's discipline would have provided to the patient under the same or similar circumstances and within the same community." *Id*. at 444. That standard of care required that the defendants take reasonable steps to come to a diagnosis under the circumstances, including seeking testing for a genetic disorder, as well as communicating a diagnosis of a genetic disorder to the plaintiffs as the legal guardians and biological parents of the patient. The actions a reasonably prudent medical professional would be expected to take under such circumstances was also the source of the parents' reasonable expectation that they would receive warnings about their own genetic risks. The court observed further that recognizing the physician's duty to provide such information to the parents did not present a conflict with the physician's duty to protect their patient's interest in the privacy of their medical information. *Id.* at 447-48.

The relevant question here is whether recognizing that defendants have a duty to protect Maltais from being injured by their patient, N.H., would undermine the care that they have a duty to provide to N.H. Maltais, like all persons, has "a legally protected interest to be 'free from physical harm at the hands of another.'" *Scott v. Kesselring*, 370 Or 1, 17, 513 P3d 581 (2022) (quoting *Philibert v. Kluser*, 360 Or 698, 703, 385 P3d 1038 (2016)). We follow *Tomlinson*'s approach and look to the professional standard of care for guidance. Because the physical injury that Maltais suffered allegedly resulted from N.H.'s psychiatric condition, the issue posed is whether defendants' professional standard of care included a duty to guard against that harm, and what steps they were obligated to take to fulfill that duty. *See Curtis v. MRI Imaging Services II*, 327 Or 9, 15-16, 956 P2d 960 (1998) (where the standard of care in a particular medical profession dictates that precautions should be taken to avoid or minimize a harm, a professional can be liable for

failing to meet that standard of care); *Restatement (Third) of Torts: Phys. & Emot. Harm* § 41 comment g (2012) (When a patient poses a risk of harm, a mental health professional has a duty of reasonable care under the circumstances and that "reasonable care may require providing appropriate treatment, warning others of the risks posed by the patient, seeking the patient's agreement to a voluntary commitment, making efforts to commit the patient involuntarily, or taking other steps to ameliorate the risk posed by the patient.").

As relevant here, the complaint alleges that because defendants negligently failed to diagnose N.H. as dangerous to himself and others, they thereby failed to "restrain, admit, or secure" him. Plaintiffs also invoke the professional standard of care in alleging that their injuries resulted from defendants' "conduct beneath the level of care that reasonably prudent, careful, and skilled practitioners of the respective disciplines would be expected to provide under the same or similar circumstances within this community." Here, as in *Tomlinson*, the theory of recovery is that the standard of care that applies to a medical professional's treatment of their patient generates a duty to protect the interests of a nonpatient. Plaintiffs pled facts that, if proved, would show that defendants undertook to treat N.H., a patient who posed physical risks to himself and others, that they negligently failed to appropriately assess his psychiatric condition, and thus to discover that his condition created a risk of physical harm to his family members. Plaintiffs sufficiently pleaded the theory that defendants' professional duty of care under these circumstances would include a duty to restrain or admit patients to mitigate the risks of physical harm that they pose to others. A reasonable factfinder could also conclude based on the facts alleged that defendants did not mitigate that risk by restraining or admitting N.H., and that the harms suffered by plaintiffs resulted from defendants' failure to do so.[6]

---

[6] In *Curtis*, the court inferred that "particular aspects of the relevant standard of care were at issue," based on the plaintiff's allegations: a duty to warn of the MRI procedure's possible claustrophobic effects, to monitor the patient appropriately, and to terminate the procedure if the patient begins to experience physical or psychological difficulties. 327 Or at 14. The court observed that "a medical professional may operate under a standard of care that includes a specific duty to be aware of and guard against particular adverse psychological reactions or

        Defendants point to the provider's obligation to protect N.H.'s liberty interest and posit that a duty to protect that interest would conflict with a duty to protect Maltais's interest in her physical safety. They contend that recognizing a duty to protect Maltais's physical safety would require defendants to commit or otherwise restrain N.H. against his will. Whatever the merits of that argument in the abstract, it does not track the factual allegations in this case: The complaint alleges defendants negligently failed to "restrain, admit, or secure" N.H., and also that he "wanted to be admitted." Taking the latter factual allegation as true, this is not a case in which involuntary commitment is at issue.

        Reversed and remanded.

---

consequences to medical procedures." *Id.* at 14-15. It concluded that the complaint was sufficient to state a claim for malpractice because it adequately alleged that the medical professionals owed a duty to plaintiff to identify and guard against predictable psychological reactions to the MRI procedure. *Id.* at 16.

    Here, plaintiffs allege that defendants failed to admit or restrain N.H. under circumstances where he posed a danger to others. The remaining allegations relate to defendants' failure to appropriately assess N.H.'s dangerousness. As in *Curtis*, those allegations support an inference that "particular aspects of the relevant standard of care" are at issue, that is, what a reasonable practitioner should do under conditions where their patient poses a danger. As in *Curtis*, that is sufficient to state a claim. The specific conduct that is required by that standard of care is a fact-dependent issue, and common-law principles of reasonable care are relevant to that issue. *See Piazza v. Kellim*, 360 Or 58, 73 n 9, 377 P3d 492 (2016) ("[I]f the special relationship (or status or standard of conduct) does not prescribe a particular scope of duty, then common law principles of reasonable care and foreseeability of harm are relevant." (Internal quotation marks and brackets omitted.)).